1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PAUL AMOROSO,

                        Plaintiff,

        v.

SUN LIFE ASSURANCE COMPANY
OF CANADA,

                        Defendant.

CASE NO. C20-5887 BHS

ORDER ON RULE 52 CROSS-
MOTIONS FOR JUDGMENT

        THIS MATTER is before the Court on Plaintiff Paul Amoroso's Rule 52 motion

for judgment, Dkt. 18, and Defendant Sun Life Assurance Company of Canada's cross-

motion for judgment, Dkt. 19. The Court has considered the filings and the record. Its

rulings follow.

## I.   BACKGROUND

        Amoroso was employed as a Physician Executive with MultiCare Health System,

overseeing a large group of medical researchers. He suffers from mental health

conditions including depression, anxiety, and attention and task-completion disorders.

Neuropsychological examinations in 2009 and 2010 "revealed deficits consistent with

attention deficit disorder." Dkt. 18 at 4 (citing AR 855–60, 869–71). From 2011 through 2016, Amoroso was employed as a Medical Director at MultiCare and transitioned to his role as a Physician Executive in 2016. Dkt. 20 at AR 746.

In 2017, Amoroso told his psychiatrist, Dr. Tim Earnest, that he was concerned he was not functioning as well as needed at work, but that he has had good reviews and "others feel he is performing sufficiently." AR 1649. In mid-2018, Amoroso experienced anxiety and depression based on the impact his focus-based symptoms were having on his work performance and sought treatment. AR 1865.

Amoroso took partial leave under the Family Medical Leave Act ("FMLA"), beginning December 14, 2018 and ending 80 days later on March 4, 2019. On his reduced schedule, he worked four days per week, using a combination of paid time off and unpaid leave under the FMLA for the fifth day. As a result, Amoroso did not earn less than 80% of his pay during his reduced work schedule. He saw some improvement in his symptoms in the context of his reduced work responsibilities. AR 1831–42.

Amoroso initially applied for 90 days of FMLA leave but returned to full time work after 80 days. He worked full time from March 4, 2019 through April 26, 2019, when Amoroso resigned from his job. He had announced his resignation prior to his departure from work and discussed with his psychiatrist, Dr. George Jackson, that in anticipation of leaving his job, he had a corresponding improvement in symptoms. AR 1141. After his resignation, Amoroso told Earnest that he left work due to concerns about his effectiveness, but that his supervisor did not share those concerns. AR 1433.

After his resigned, Amoroso underwent a neuropsychological consultation with

Glen T. Goodwin, PhD. AR 270–87. Dr. Goodwin found that

> On neurocognitive testing, within the context of very superior general ability and very superior verbal comprehension, there are clearly areas of deficit seen on a task of divided attention, freedom from interference (response inhibition) and dependent on processing speed. There are also deficits seen on a task of complex sequencing, involving multitasking with two notions simultaneously. In a broader sense, he displays clinically significant weaknesses in auditory working memory and processing speed relative to his verbal comprehension. There [are] also clinically significant weaknesses evident in visual working memory, visual memory, immediate memory and delayed memory relative to his general ability. There also appears to be a decline evident on a task of reasoning, problem solving and concept formation (although this would need to be corroborated with actual comparison of the previous raw test data.

AR 1976. Goodwin concluded:

> I would estimate that he is not work tolerant from a neuropsychological standpoint in any similar competitive employment situation at this time. For a physician, even involved in doing research, there is little room for error and given his pattern of neuropsychological symptomatology and the evidence on objective neurocognitive and neurobehavioral testing, I can certainly appreciate why he resigned himself to the decision to cease his employment.

AR 1977.

Amoroso sought long-term disability benefits from MultiCare's group disability

insurer, Sun Life, in July 2019, claiming a disability onset date of December 14, 2018

(the date he first took FMLA leave). AR 744. As part of its investigation, a Sun Life

representative interviewed Amoroso. The summary of interview reported:

> [Amoroso] took 90 days of family medical leave with plans to return with certain restrictions. He was on track to return in a more part-time capacity with no management responsibilities; however, he spoke with some of his colleagues, who, he stated, had some resentment toward him about his

1

2

leave. He decided it was not a good environment for him to return to and he resigned.

3

AR 300. Sun Life also had Dr. Margaret O'Connor also review Amoroso's claim. She

4

concluded that, while his records show attention problems for many years, including

5

during medical school, and an "[u]pdated assessment and raw data from Dr. Goodwin

6

continues to suggest attention problems," "there is no evidence of significant cognitive

7

impairment in any area." AR 1103.

8

Sun Life denied benefits, concluding that Amoroso had not established disability

9

throughout the policy's 90-day Elimination Period. AR 1355–63. Amoroso appealed,

10

providing recent medical records and a vocational evaluation. AR 1993–2051; AR 1397–

11

1455. Reviewing neuropsychologist David A. Miller, PhD, determined that Amoroso's

12

records did not support restrictions or limitations preventing him from functioning

13

effectively as an executive physician. AR 1510. Specific to Dr. Goodwin's conclusions,

14

Dr. Miller reasoned that

15

16

17

[I]t is unwarranted to assume that all of [Amoroso's] abilities must be commensurate with his strengths in order for him to function adequately in his chosen occupation. Indeed, the most compelling evidence of his ability to perform adequately in his chosen occupation is his satisfactory performance in it since 2011.

18

AR 1514.

19

Amoroso sued, seeking long term benefits under the Sun Life policy, on the

20

Administrative Record of his claim to Sun Life. His complaint alleges he became

21

disabled on April 26, 2019, the day he resigned. Dkt. 1.

22

## II.   DISCUSSION

**A.   Standard of Review**

The parties agree that the Court reviews this denial of long-term disability benefits under ERISA *de novo*. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (citations omitted) (denial of benefits is reviewed *de novo* when a plan does not confer discretion on the administrator to determine eligibility or construe the terms of a plan). Under *de novo* review, "the court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Id*.

The claimant has the burden of proof, *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010), and the court makes findings of fact and weighs evidence, *Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1069 (9th Cir. 1999), in contrast to a summary judgment decision. Generally, "only the evidence that was before the plan administrator at the time of determination should be considered." *Opeta v. Nw. Airlines Pension Plan for Cont. Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007) (citing *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943–44 (9th Cir. 1995)).

**B.   Findings of Fact and Conclusions of Law**

Sun Life contends that Amoroso's request for benefits should be denied, primarily because he did not and cannot demonstrate that he was disabled for 90 consecutive days while he was in coverage, as required by the Policy's Elimination Period. Dkt. 19 at 20.

Sun Life's Policy pays benefits to partially replace income lost by employees who become disabled—partially[1] or totally— while insured. AR 00038, 00174. "Totally Disabled" under the policy means the insured employee is "unable to perform one or more of the Material and Substantial Duties of his Regular Occupation." AR 00176. Sun Life will pay benefits for a period of disability, if the claimant: "[1] sends Proof [] that you have become disabled; [2] are insured under the Policy at the time your Disability commences, and [3] have completed your Elimination Period[.]" AR 00038.

The Policy's Elimination Period is defined as "the number of consecutive days of Disability, shown in the Benefit Highlights, which must be completed before we will pay you the benefit." AR 168, 171. The parties agree that the applicable Elimination Period is 90 days.

Sun Life argues persuasively that Amoroso did not and cannot demonstrate 90 consecutive days of Partial or Total Disability based on the onset date he initially claimed, December 14, 2018; he was on only a reduced (four days/week) work schedule for 80 days, lost no pay, and returned to work full time. Amoroso now alleges that his disability onset date was April 26, 2019, his last day of work. Dkt. 1, ¶ 11.

Sun Life argues that Amoroso's revised claim that he only became disabled after he voluntarily resigned does not satisfy the Policy's Elimination Period. It appears to

---

[1] "Partial Disability" under the Policy means "you: [1] are unable to perform all of the material and substantial duties of your Regular Occupation on a Full-time Basis; and [2] have Disability Earnings of less than 80% of your Indexed Total Monthly Earnings." AR 0174. It is undisputed that Amoroso did not earn less than 80% of his regular salary and was thus not partially disabled under the Policy. The issue is whether he was totally disabled while he was insured.

contend that the Elimination Period cannot run after an employee voluntarily resigns or is otherwise terminated. *See, e.g.*, Dkt. 27 at 2 ("Plaintiff now asserts facts such that the Elimination Period of 90-days continuous Disability did not run while he was in coverage.").

Both parties cite a somewhat similar case from this District, *Kollar v. Sun Life Assurance Co. of Canada*, Cause No. 3:19-cv-5180-RBL, 2019 WL 6839335 (W.D. Wash. Dec. 16, 2019). *Kollar* involved a claim for short-term disability benefits. The plaintiff employee was terminated for reasons unrelated to his claimed short-term disability, and in litigation claimed that his disability onset date was the date of his termination. The insurer, Sun Life, conceded that it was "possible" that Kollar could have been covered if he could prove he became disabled after his employment was terminated, but prior to the expiration of his policy some 7 hours later, at 11:59:59 p.m. of his last day of work. *Id.* at *3. The Court concluded that Kollar could not so prove because he worked full time until he was fired, and there was thus no evidence supporting his claim that he was "incapable" of performing one or more of the material and substantial duties of his job. *Id.* at *4.

Amoroso's briefing does not directly address the Policy's Elimination Period, *see* Dkts. 18 and 24, and he does not identify the 90 consecutive days he claims he was disabled or how he otherwise satisfied the Policy's Elimination Period. Indeed, he seeks to distinguish *Kollar* on the basis that he—unlike Kollar—does *not* claim he became disabled *after* his resignation; he claims he was disabled for months before he ultimately was forced to resign to preserve his mental health. Dkt. 24 at 10. Amoroso apparently

1   seeks to rely on Judge Leighton's observation in *Kollar* that it is possible that one may

2   keep trying to work despite being unable to perform their job. 2019 WL 6839335 at *4.

3   Like Kollar, though, Amoroso has not established that he is that hypothetical case.

4         Sun Life objects to Amoroso's effort to revise his onset date, arguing that the

5   undisputed record evidence is that he claims he became "unable to work" full time on

6   December 14, 2018. AR 000714. It is undisputable that Amoroso was able to return to

7   work 80 days later and that he then worked full time until he voluntarily resigned, as he

8   announced he planned to do, on April 26, 2019. It points out there is no evidence

9   supporting Amoroso's claim he became disabled on the newly-claimed onset date, that he

10  was insured when the claimed disability arose on that date, or that he was insured for 90

11  consecutive days after that new onset date.

12        Sun Life also argues persuasively that it never had the opportunity to administer or

13  evaluate Amoroso's Long-Term disability benefits claim based on his now-asserted

14  position that he became totally disabled on April 26, 2019, presumably after he resigned

15  but before his policy expired at the end of that day. Dkt. 27 at 3.

16        Furthermore, Sun Life persuasively argues that Amoroso cannot meet his burden

17  of proof to establish that he was disabled while he was insured and that he lost income

18  while he was covered under the policy. Amoroso himself has articulated two versions of

19  his reason for resigning. One version is that he perceived his co-workers resented him for

20  taking FMLA leave. The other is that he could not perform his work to his own standards,

21  though he concedes his employer and his co-workers believed he was adequately

22  performing his job up until he resigned. AR 1433 and 1649. Even Amoroso's

1    neuropsychologist, Goodwin, describes his disability in equivocal terms: Goodwin

2    "estimates" that Amoroso is "not work tolerant" and that he, Goodwin, can appreciate

3    why Amoroso resigned. AR 1977.

4         The Court concludes that, on this record, Amoroso has not met his burden of

5    proving that he was disabled for 90 consecutive days while he was insured, or that he was

6    unable to perform the material and substantial aspects of his position on either of his

7    claimed disability onset dates. Amoroso is not entitled to Long Term Benefits under the

8    Sun Life Policy.

9         SunLife's Motion for Judgment under Rule 52, Dkt. 19, is therefore **GRANTED**,

10   and Amoroso's Motion for Judgment, Dkt. 18, is **DENIED**.

11        The Clerk shall enter a judgment consistent with this order and close the case.

12        **IT IS SO ORDERED.**

13        Dated this 2nd day of September, 2021.

14

15

16                                    BENJAMIN H. SETTLE
                                      United States District Judge
17

18

19

20

21

22